cases on our docket, and the first is Assintial Enterprise Solutions versus U.S. SBA, number 25-1367. And we've got counsel. Can you hear us? Yes, Your Honor. Can you hear me? Yes, we can. Yes, we can. So will you be reserving time? Yes, Your Honor. If I might reserve five minutes for a vote, please. Okay, that'll be granted. Okay, you may proceed when you're ready. Thank you, Your Honor. Adam Jed on behalf of the United States. May it please the court, and first of all, I just wanted to thank the court's indulgence in allowing me to participate in this argument by Zoom today. Of course. Plaintiff applied for and received a $7 million loan under the Paycheck Protection Program by certifying that its monthly payroll was nearly $3 million. But as SBA later discovered, Plaintiff's payroll was much smaller, and Plaintiff was therefore eligible for a loan of roughly half that size. SBA therefore determined that Plaintiff would have to repay approximately half of the loan. Plaintiff asked this court to reject the conclusions of other courts by urging that payroll comprises not just what a business pays its employees, but also what a business previously paid and sold for private and independent contractors, who can in turn look to those payments for purposes of their own PPP loans. Well, I mean, you say other courts. You're talking about two other courts of appeals. Of course, that's not binding on us, right? Their opinions? Of course. Of course, Your Honor. We've got at least one court that goes the other way, and that's the one we're reviewing today. So, I mean, this whole thing, it's funny. This whole thing comes down to and. Normally, we don't have cases like that. So, I mean, your adversary points out, essentially, aren't we, aren't you suggesting we create some ambiguity by not giving full value to the and that's in the statute? Just, Your Honor, I wanted to direct that address directly because I actually think it's common ground among all of the parties and the district court that and means and, as the, you know, admittedly not binding, of course, you know, Fifth and Sixth Circuit decisions explained, and as also the Supreme Court explained in Pulse Absorber, it's just, it's a connector. Basically, everyone agrees that it's conjunctive. Everyone agrees that it's connecting these two definitions. The question then is just like, what does BB mean? Does BB, section BB, in that payroll cost definition refer to both the money going out and the money going in, or is it just the money that's being earned by an independent contractor and sole proprietor? So, I don't think there's actually any dispute about what and means. The only dispute is about what the text that surrounds and means. Right. Okay. Fair enough. But you, what argument you made dealt with the, I guess, in AA, it said the sum of payments of any compensation and then whatever follows, that's repeated in B. Can you explain to us why it is that by just by repeating those words, it's something separate? Sure. So, I think there are two answers to that question. One is, we don't think that that phrase actually means anything different in AA and BB. The payment of compensation is- I'm not saying it's something different, counsel. I'm just saying, somehow you're saying this supports your argument. I'm just trying to understand why. So, I'm not sure that we've made any argument that the duplication of that phrase as between the AA and BB supports our argument. I think we have pointed out that the structure, the fact that this is set up in an AA and BB structure, rather than just a single list, supports our argument. As in the Fifth Circuit, it plain, under the plaintiff's reasoning, this would just be one list of every kind of possible payment that a business could make. I think that the AA, BB structure, I mean, as the name of the program, the Paycheck Protection Program illustrates, essentially you've got two categories of folks who are eligible for loans, small businesses, and then independent contractors and sole proprietors. And the statute is set up so that people can be paid. So, employees get paid through their employers who receive loans tied to payroll costs, and then loan forgiveness if they don't cut employee numbers or employee pay. And then self-employed persons, and this is what BB is doing in the definition, who can get their own loans tied to their past earnings. Now, I do think, Your Honor, that phrase that you honed in on, as we urge, is tied to a sort of singular plural distinction. So, if you look in AA, it says, with respect to employees. And if you look in BB, it says, compensation to or income of a sole proprietor or independent contractor. Obviously, lots of small businesses have both independent contractors and sole proprietors. There may be a range of them. It may be someone who's, in some sense, part of the perk force as compared to someone who just came in six months ago to fix the broken boiler. And the fact that it is written in the singular and the destructive, we think, underscores that this is written from the perspective of the person who's getting the loan, the single, either independent contractor or sole proprietor, who is applying for a loan and looking to their own earnings. So, you're saying that if you had one employee, you wouldn't be able to recover anything if they use the singular in AA? No, Your Honor. I think it says, with respect to employees. So, if you have one employee or 10 employees, your payments to those employees would be part of the payroll cost. I think what we're just honing in on is, why is it that Congress would use the plural in one and use both singular and destructive in the other? In other words, sort of naturally, if you were just saying any employee, you might say plural employees. And then under the plaintiff's reading, you would say sole proprietors and independent contractors. Instead, it says sole proprietor or independent contractor. And that singular and destructive phrasing is just a sort of further textual clue that BB is written from the perspective of the individual who's applying for and receiving a loan. Yeah. I guess that's one way to read it. I mean, what if you had hired two independent contractors? I don't know. It wouldn't cover it? Well, Your Honor, again, our position is that the payments that a business is making to an employee, I think that if you hired two independent contractors, the question is probably a problem for the plaintiff's argument. Because under the plaintiff's argument, why then is it that it says singular and independent contractors? I'm just trying to follow your argument to its conclusion. You're saying there's some sort of significance to using a singular versus a plural in two different places. But, okay. That's great. And I should say, I mean, again, this is obviously just one of many textual clues in the statute. I think as the Fifth and Sixth Circuit said, if you just look at that phrase in BB, it reads as a single integrated phrase where it's using terms like compensation, which could potentially be from either side of the transaction's perspective, and income, which is clearly about earnings almost interchangeably. And then you have so many other phrases in the statute. Oh, I'm sorry. What is your position on the IFR and how it works, in this case, if at all? So the interim's final rule obviously contains many different provisions. As relevant here, there was a provision of it that was just interpretive. And I think the district court correctly said that all it was doing was just parsing the statute. I get it. My question, I guess to narrow it down a little bit for you, are you relying on that here? Do you want us to engage in the retroactivity analysis that I think district court was concerned about? Do you need it here? We do not. The plaintiffs in district court seems to be arguing that the IFR had some kind of legal force and was being applied retroactively to them. The district court ruled against them. I don't take them to have offered that as an alternate grounds for affirmance on appeal. Other parties and other cases have urged this. As the Fifth Circuit said, the IFR is just interpretive. And so therefore, I mean, there are various reasons that it wouldn't be retroactive. But because it's interpretive, it's just the agency giving its explanation of the statute. So I think it's common ground that to dispose of this appeal, the court just needs to determine the best interpretation of the statute. Yeah, I get that. My question is, are you asking us to put any weight on the agency's interpretation? Oh, I see. I apologize. I think the answer is maybe just a bit as a backup and for two different reasons. And maybe if I could just sort of explain that briefly. One is we've made this kind of, some might call it ratification, some might call it acquiescence-type argument, that once the agency made its interpretation of the statute quite clear in the IFR, not only did Congress not reject that interpretation, but Congress continued to extend the duration of the program, engage with the IFR, actually reject other rules that were in the IFR that Congress actually altered what constitutes payroll costs. But in none of those amendments did Congress in any way reject the relevant interpretation from the IFR that is at issue here. And then the second argument we've made is just a Skidmore deference argument. Is there anything in the congressional record to suggest that Congress considered the IFR or anything to add some force to that argument that they looked at this? I'm not aware of anything in the record to say that Congress looked at this specific interpretation. I would say two things in response. One is I think in some of the kind of classic acquiescence-type cases, we cited several of them, and I believe Judge White concurring with Veltor actually for this very interpretation made the same point. I don't know that there needs to be kind of proof that Congress like specifically engaged with that interpretation. But second, I will say here, I mean, the acquiescence argument is at least a because we do know that Congress was, it's not just that Congress like never amended the statute, Congress did repeatedly extend the program, repeatedly amend the statute, amend, among other things, the definition of payroll costs. So I don't have sort of definitive evidence that Congress was aware of and agreed with the particular interpretation in this case. But if nothing else, as compared to some other cases where acquiescence comes up, Congress was actually quite engaged with this program. I mean, my sense is that Congress was engaged, but that this was a very challenging, fast-paced and emergency environment. And I'm not sure that I would give acquiescence case law as much weight when they're working as quickly as they did in these circumstances. And I think there's a number of fair arguments to be made about vagueness and confusion in this statute and the CARES Act as it we don't think our argument kind of rises and falls on acquiescence. We've made a number of other statutory arguments. I will just to push back on that premise slightly say that when Congress drafted the CARES Act initially, obviously it was an incredible rush and an emergency, but we then do have a series of amendments and extensions that occurred over the next year. Now, I have no doubt that Congress, of course, was very busy during the height of COVID, but we're not then just talking about that sort of initial week or two when the statute was being drafted. Yeah. Just very briefly, in BB, if we were for a moment to just take out the part about sole proprietors, the first phrase of BB would be the sum of payments of any compensation to an independent contractor. I'm putting the article and in there. So compensation to an independent contractor. What work does the word to do there? Does it connote that someone, this is speaking to the payor? I don't think it does. I mean, that payment of, and I want to sort of focus in on the kind of edit of the statute that you've created. The payment of compensation to an independent contractor is the transfer of money. So it means that the payment was made to an independent contractor rather than to like a 500 person corporation. Instead it's to a one person sole proprietorship or one person entity or something like that. And then the question is just who gets to lay claim to that payment. I think your honor's question kind of underscores a feature of the plaintiff's argument and I suppose the district court's decision, which is if you look solely at that phrase in a vacuum, if all you had was payment of compensation to an independent contractor, as we point out in our brief, I think you could read that as coming from kind of either perspective. So if, for example, a payment of compensation to an independent contractor triggered some kind of a reporting requirement, the reporting requirement could fall on the payor, could fall on the payee, or it could fall on both. But if you zoom out just a tiny bit and then you see the word income nested in there, income we know is about earnings. It's only from the receiver's perspective. That suggests that it's from the receiver's perspective. If you then jump to the next phrase, which is essentially using those terms interchangeably, it says things like wage, commission, income, and then at the end jumps to similar compensation. So that means then that a phrase like income, which we know is from the earner's perspective, is in fact a kind of compensation. I think this is the point that the Fifth Circuit had stressed. And then of course, if you kind of zoom out further, you get the AB structure, the singular plural distinction, and then I think something we haven't talked yet much about this morning, just a litany of other statutory provisions that presuppose our interpretation of the statute. It would be, you know, quite anomalous if on the front end a business could count its payments to employees and sole proprietors and independent contractors, but then only a reduction in the number of employees or employee wages was relevant when it came time for loan forgiveness. Or there was only an exclusion for payments made to foreign employees, but not an exclusion made to foreign independent contractors and sole proprietors. And obviously there are a litany of other anomalies that we point out in our brief. You, it seems that you're arguing that BB is an exclusion. If that's the case, why wouldn't it have been under Section 2, which deals with the exclusions? I don't think we are saying that BB is an exclusion. I think it's essentially that it says payroll cost means, and then it says means AA and BB. And so it's giving two different types of payroll costs. AA is essentially employment payroll costs. BB are essentially self-employment payroll costs. And as we point out in our brief, those aren't hermetically sealed. You could potentially have someone who's eligible for both. If you have like a sole proprietorship that also has an employee, then the earnings of that sole proprietor would be the self-employment payroll costs. The payments that that sole proprietor makes to an employee would be employment payroll costs. And it would be able to kind of count both towards its payroll costs. Now, Your Honor is, of course, correct. When you get down to Part 2, you do then have a number of additional exclusions. And I think what those are basically doing is taking things that otherwise would seem to have been encompassed in the AA or BB, such as a payment to a non-resident employee, and is saying, okay, but those don't count. And again, the fact that it would focus just on non-resident employees and not on sole proprietors or independent contractors, I think underscores that on the front end, it's not that both employees and sole proprietors and independent contractors would count for purposes of the payroll costs. Just one more question. Within 636, there is a subsection, a capital F, allowable use of covered loans. And then under that, there is a small Roman I, delegated authority. It's a section that's about authority to banks to make loans. So under that, there's a capital, a large Roman II, considerations. And it says, in evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower was in operation on February 15th, 2020, and, and here's the relevant part, either had employed, well, it's, take out the either. That was my editorial. And BB, AA, had employees for whom the borrower paid salaries and payroll taxes, or BB paid independent contractors as reported on a form 1099-MISC. So if the loan, if the bank is to consider when making a covered loan, whether the borrower had employees or paid independent contractors, why, why doesn't that indicate that it's payments, if the employee, it's the borrower's payments to an independent contractor, that would be relevant for payroll costs. I'm sorry, I see that the red light on the podium is on, if I assume it. That's okay, go ahead. So, you know, we, we respond to this new argument at some length in our five weeks, and I think there are kind of a couple of layers of response to that. First, Judge Freeman, I just want to say up front, the text that you phoned in on is just about independent contractors, not sole proprietors. And it's actually just about a subset of independent contractors, those that receive 1099s. As we point out in our opening brief, not every independent contractor does receive a 1099. It depends on the kind of work they do, the amount of money that they're being paid. So if nothing else, unless the plaintiffs have some theory for why that subset of independent contractors would count towards payroll costs and nothing else would, and I don't think that's their theory, I think their view is independent contractors and sole proprietors all rise and fall together, then it means that provision can't actually be doing any work for them. Now, second, you know, I think that provision, as we point out, obviously, it's not about defining payroll costs. What we understand it to be doing is essentially tracking an eligibility concern. So basically, Congress didn't want something that, like, wasn't a real business to suddenly be able to get a PPP loan. And so effectively, in the section that Your Honor is focused in on, there are kind of two tests for this. One is it saying, consider whether they were in operation. And our view is that if all it asked was whether they were in operation, that might be kind of over and under inclusive. Like, you might get something that was just a shell corporation, or you might get something that on that relevant statutory trigger date, February 15th, in the text that Your Honor is focused on, for some reason, it wasn't in operation on that date. So effectively, what it's looking to is, I think Judge Sutton's opinion in the sort of Sixth Circuit described this as whether there's objectively verifiable evidence that it was a real going concern. So if you have employees, if you have that subset of independent contractors for which you're issuing 1099s, there's basically paperwork where you can produce it and say, look, we're, there's some kind of actual... Okay, but I mean, this is all about the paycheck protection and loans. So why, and, you know, so what they're saying here is either if you have, if you either have employees or you paid a certain subset of independent contractors, then that is of relevance to giving, to receiving a loan. So why, the or there seems to be doing a lot of work, because either would suffice, either employees or 1099 MISC contractors, right? Well, critically, Judge Sutton, I think I take the rest of your question to be like, what if you just had independent contractors and not employees? Like, why would you be at that point if you don't have payroll costs? And the answer to that is, if your honor looks at the statutory formula for payroll costs, it's not just like what your payroll was at that moment on February 15th or immediately around it. There's a kind of large time window. So you can potentially have a business that has payroll costs in the relevant time window. It previously had employees that time, hire employees, which is in that moment, they just have independent contractors. And there are actually two specific statutory provisions that I think kind of really illustrate this, where they talk about seasonal employees or seasonal businesses or new businesses. So if you have someone who just sort of set up a new business, you might have like hired an independent contractor to, you know, like help you incorporate or something along those lines. Don't yet have employees or about to have employees, or you might have, imagine like a Christmas tree farm last September, October, November, December, you had tons of employees on your payroll. They're all going to be relevant to your payroll costs. But now it's February 15th. You might not have any employees on your payroll. You might just have, you know, an independent contractor or two that are doing something to maintain the field or, you know, helping to collect bills, sort of something along those lines that shows that you're a real ongoing concern. But nonetheless, you will still actually have payroll costs. And unless the court has any other questions, I'm not sure. We'll hear from you on rebuttal. Thank you. And we'll hear from the appellee now. Good morning. I may please the court. Brett Wacker appearing on behalf of Central Enterprise Solutions. The district court correctly held under the unambiguous language of the CARES Act that the SBA acted without authority but refused to forgive Essentials PPP loan in full. As the court obviously recognized the critical question before the court, it was the district court correct in finding that the definition, the statutory definition of payroll cost was ambiguous. And the answer to that question lies in whether or the conjunctive and that connects the two paragraphs AA and BB should be read in its reasonable and ordinary term. And as the district court recognized in its opinion, we start with the plain language of the statute. And if the plain language of the statute is unambiguous, that's where it ends. The exception to that rule would be if that plain language ends up with some bizarre result that Congress could not have anticipated, then we would look into it. And again, going back and sort of repeating what we've already talked about a little bit with my friend, is that the statutory definition is broken into two main sections. Section AA, which discusses W-2 employees. Section BB, which discusses independent contractors and some other groups. And then it connects those two with the very normal term and the conjunctive and. Then it ends with, as your honor mentioned, it ends with this list of excluded costs, none of which refer to independent contractors. So if I'm a reasonable businessman in the height of the pandemic, where the nation was facing probably the worst health crisis that it faced in a century and a potential economic collapse, you're reading this statute and you read the word, you read AA and BB, and you come up with that it means both. It means that I'm allowed to do both. All right. Interestingly enough, I guess I should just say, as I read Third Circuit precedent, and means and, unless there can be a showing that there's some context to read it some other way. Here, at least as I read the SBA's briefs, the SBA has provided no context why we should read and any differently. And I think it's important to go through why that's true. The PPB borrowers at the time of application were required to, or when they got their loans, were required to spend these loans to retain workers. That's a very specific term that the CARES Act uses. And the failure to do that would jeopardize forgiveness, which is the most important feature of All right. And then if Congress had meant to retain employees, it obviously could have used that word. PPP borrowers were also required- I've got a factual question. How much, if anything, did essential spend on independent contractors during the pandemic? In the end of the day, they actually were able to increase their W-2 employee count so that all of their payroll costs were paid to W-2 employees. They counted independent contractors in the application and then sought forgiveness? Correct. At the time of application, in early April, they had about 50 percent W-2 employees and 50 percent 1099 workers. So is the answer to my question zero? They spent zero dollars on independent contractors during the pandemic period? Yes, that is correct. That's what the record shows. The record shows that, and the district court recognized that, that they spent- And then they sought forgiveness based on independent contractor numbers? No, they sought forgiveness that they met the forgiveness requirements, which is that you spend, well, originally the SBA's regulation said 75 percent on payroll costs, but later Congress changed that to 60 percent. So what they did was they met that obligation, which was to spend 60 percent of their funds on payroll costs. There's no requirement that the payroll costs, remember, which is just a number, the payroll costs were individuals that you went to and said, I need to pay Bob or Sally, and then you get to forgiveness and I paid Bob and Sally. That's not how the statute works. It asks you to do a mathematical calculation to find out how many payroll costs you have. I'm not suggesting that the asymmetry should govern the textual analysis here, but the context is that there were numbers submitted that based on independent contractors, that was a figure that the SBA could look at to estimate what this business, how this business was operating, and then that money was not spent on independent, the loan proceeds were not spent to keep independent contractors on the books. I'm not sure that that's how I would have read the best statute. I don't think that's what the statute says. I'm not talking, I'm talking about just factually in the context of how this loan was applied for and administered. That's the basic record. Yeah, the factual record is that when Essential calculated its maximum loan amount, it included in its payroll costs, costs that it paid to 1099 workers as well as costs that it paid to W-2. That is correct. And then when it applied for forgiveness and it calculated its payroll costs, all those costs were W-2 employees. Am I answering your question? And I just want to sort of build a little bit on a question that Judge Freeman put to your friend about ambiguity. I don't read our Reese case about the use of the word and as broadly as you do, but even if I did, isn't the ambiguity here really in BB and right around that, the two words to or, so compensation to or income of, isn't that where the ambiguity is here that we have to figure out? I don't know that it does. And I think it depends on what ambiguity we're referring to or referring to ambiguity in terms of whether someone comes to forgiveness and they say, I use this cost and I shouldn't have. Is that it? I can't, for me, the ambiguity lies in the connector between AA and BB. That's the question, whether the ambiguity lies there. Deciding whether there's ambiguity in an individual. Well, I think that the argument on the other side is that AA is directed to one type of business and BB is directed to another. Correct. And your position is that and is unambiguous. And so these apply in the same way. My question is, isn't the ambiguity that gives rise to the interpretive question around the two words to or in BB? Do you have just a plain meaning this is unambiguous reading of that? I don't know that I would concede that there's ambiguity in that. I guess I'm not following. How do you read? I think you probably have it up there. In BB, you're talking specifically about? The sum of payments of any compensation to or income of a sole proprietor. And it seems that if one of the interpretive challenges that we're confronting, one of the places where there is ambiguity here is around how to read those two clauses delineated by to or. Well, I would agree that reasonable people could come with different interpretations of that. I don't know that that discussion changes the calculus of whether or not we read this as AA and BB. So I guess to me, that sounds like a hunting expedition to find ambiguity. No, that's right. And the clause that's at the center of the argument. And I think what I'm getting at is you obviously have arguments and some of them are compelling. The district court found them compelling. I get all that. But the frontline argument that there's no ambiguity here, I struggle with. Correct. And I think that not only did this district court find no ambiguity, but the trial courts in Louisiana in the Seville case and the trial courts in Del Tor in Eastern District of Michigan found no ambiguity. Both of those trial courts found no ambiguity. And it's interesting, too, when you go to the circuits, the Fifth Circuit, you mentioned, Your Honor, the Fifth and Sixth Circuit. The Fifth and Sixth Circuit opinions, interestingly enough, if you search through those opinions, you'll never find the word ambiguous or unambiguous. They don't even make that decision. So I'm sort of left with, did they find ambiguity or did they not? But again, the trial courts, so we have three trial unambiguous definitions. Can I ask you to respond to your adversary's argument about the plural use of employees in AA and the singular sole proprietor independent contractor? What's the significance of that in your view, if any? You know, I don't know that I have an answer, to be honest with you. I think that we have to remember that there are probably a lot of imperfections in this statute. It was created, you have to remember, Your Honor, that Senator McConnell introduced this legislation in the Senate in March 25th of 2020. Two days later, the President signed this into law. And so there was no debate. There was nothing. So yes, you may find these, you might be able to run through the statute and find various plurals or whatever. But the fact of the matter, that this was created that way very fast. And the program opened on April 3rd for applications. By April 16th, 13 days later, that it was lost. Yeah, it was rushed. But is there any significance to this? You know, I don't think there's any significance in terms, unless you're looking for, not you specifically, obviously, Your Honor, but unless the reader is looking for ambiguity, trying to find it. I think you still end up with the plain words of the statute. And the plain words of the statutes are AA and BB. So I guess I don't know that I answer to your question on that. Although I do find it more, again, as I said to Judge Bovey, that it sounds more like you get down that road and you end up going into a hunting expedition there. But one thing that I'd like to do, I see I'm down to the last couple of minutes here. One thing I would like to do is talk a little bit about what really is going on here. Payroll costs serves two purposes. The first purpose is to determine how much a loan should be. The second purpose is to determine how much forgiveness should be. It's the same term, they use it, you know. And what came up in the Veltor case, the reason I want to raise this is because it came up in the Veltor case, which was decided after our briefing was completed, so we didn't have a chance to address it. But what that case ultimately decided is that a business that only employs 1099 workers is ineligible in the first instance for a PPP loan. So what the SBA has done here is converted a mere calculator for a loan amount into an eligibility provision, which is an entire different section of the statute. So if I'm, it's not a common situation, if I'm a small business and all I employ are 1099 workers, according to the SBA, I have no payroll costs. Now I guess they could argue, well, you're still eligible for the loan, but that loan is zero. So that's a distinction without difference. The zero loan isn't a loan. And I think that's an important thing. And so the question comes down to, did Congress delegate the SBA with authority of changing the eligibility rules for PPP loans? Remember that I've been practicing government contract law for 40 years, and I do a lot of SBA 7A loans. And 7A loans have no eligibility exclusion for a business that has 1099 workers. And all the PPP program was an add-on to an existing 7A program. And in that, and so what the SBA ultimately ends up doing here in the real end of the game is they're saying, if you are a particular kind of business, a business that employs 1099 workers, you are ineligible for a loan. That changes the tune here. And as the Supreme Court has said, and as Justice Barrett said in her concurring opinion in Biden v. Nebraska, that's a delegation, that's a question of delegation of authority on an issue of national importance. Did Congress clearly provide the SBA with the authority to change the eligibility rules for the PPP loans? And I would posit the answer is no. But isn't the response that we just got on the other side that the point of reference for eligibility is different than for the calculation of payroll costs? And so that someone, a business could have just independent contractors at the time of the eligibility determination, but for that, the window for calculating payroll costs, a different composition of employees in 1099s. Yes. If I understand your question, Your Honor, is there two different periods of time in which you do the calculus? Isn't that the answer, though, to your point about the conflict, that there's not actually a conflict because the periods of calculation are different? No, I don't know that. I think there's a reason for that difference. You know, obviously, when you're applying for a loan, you have to calculate an average monthly payroll. So you have to, the Congress says you have to look at a period of time. And what they did was they gave them two central options. You could use the calendar year of 2019 or you could use the prior 12 month period. All right. And so that was the period you look for creating your average monthly payroll. Now, that obviously is passed. Now you have to spend the money. So now Congress says, OK, how do you spend the money? And they originally used an eight week period, but they ended up tripling that to a 24 week period. And so, yes, there would be different situations. The business at one point is different than it would be at a second point. I don't know if I'm answering that question. You got it. Thank you. OK. No, thank you. Thank you, Counselor. Thank you. OK. And we'll hear rebuttal. Thank you, Your Honor. Just a couple of quick points of rebuttal. First, just to respond to my friends focus on the word and again, it is common ground in this appeal that and means and is common grant and connects AA and BB. We read AA as employment payroll costs and we read BB as self-employment payroll costs. Those are two different kinds of payroll costs. And in some instances, you might actually have an entity such as a sole proprietor that is eligible for both. And so in some sense, I think the sort of focus on and it's just basically a red herring. Number two, just on the kind of approach to statutory interpretation here, I think my friend's argument basically reduces to the idea that BB in a vacuum is unambiguous. Well, we certainly don't think that it is unambiguous in his favor, but I also think he's just mistaken about how to approach a question of statutory interpretation. I'll give you the Supreme Court's recent decision in Halkbank as an example where in a vacuum, the relevant language was jurisdiction. It said there should be no jurisdiction. One might think that is unambiguous in a vacuum, but then when you looked at surrounding text in that provision and in other provisions that interacted with it, lo and behold, the Supreme Court held that actually it's a subset of jurisdiction in civil jurisdiction because as the court has emphasized and this court has emphasized as well over and over and over again, a statute needs to be interpreted as a whole. Finally, I do just want to emphasize obviously here, we think there are a number of textual clues in BB that cut our way and we think there are a number of other provisions in the statute that all presuppose our interpretation. And I think my friend's focus, this question of what would happen if you had a small business that only had independent contractors or sole providers, they wouldn't be able to get a loan. There's of course the timing issue that I was discussing with Judge Freeman and I think Judge Beauvais was pressing my friend on. But more to the point, remember, this is about keeping individuals paid. So if you have a never had any employees and all it has is independent contractors and sole proprietors, that business may not be able to get a paycheck protection program loan and may of course be eligible for any of the other number of kind of business relief programs that were part of the CARES Act but for purposes of this program, they might not be able to get a loan. But that independent contractor or sole proprietor can then apply for its own loan, look to the funds under BB, contrary to my friend's argument in his brief that actually sometimes they wouldn't be able to look to the payments being made in BB if a small business managed to kind of claim it first or claim it second. I'm not quite sure how he deals with the double-dipping problem. And so at that point then, essentially every worker gets paid either as an employee through a business that gets a loan based on its number of employees or as an independent contractor or sole proprietor who can get a loan on its own and then look to its past earnings to determine its payroll costs. And unless the court has any other questions, we're happy to rest on our briefs. Well, I can't help but think, you know, this is an appellee in one or party in one case. They were confused. There are other cases across the country like this. Perhaps you could address your friend's argument that all this uncertainty created a bait and switch. I think that's their words. Yeah, so I guess maybe let me give you a factual response to that and a legal response to that. Great. I mean, so just factually, look, obviously anytime you have a complex statute, people are going to make some number of mistakes. Now, I'm not here to attribute any motive. I don't know whether the plaintiff, you know, was negligent, just made an innocent mistake, kind of, who knows. But, you know, the statute is written in a certain way. And then the IFR did provide a lot more clarity on what it is that the statute means. And remember, of course, just as a factual matter, obviously, there was a finite number of dollars that everyone was competing for. So the more that someone was able to lay claim to funds that they were otherwise ineligible for, the more that somebody else might just not be able to get a PPP loan in the first place. But second, Judge Shugart, there's just a legal response to that question. And, you know, I think the Fifth Circuit and Sixth Circuit both made these points in different ways, which is the fact that there might be some ambiguity or imperfect notice or misunderstanding can actually alter the meaning of a statute. There are some parties that have made these kinds of equitable estoppel-type arguments. The plaintiff, obviously, is not advancing that argument here. We think it would fail for the many reasons that it failed in the Fifth Circuit case. And there may well be, I know that Judge White in her concurrence in the Sixth Circuit, I think at a footnote, indicated that there may well be situations where banks had misled individuals and apparently there is some litigation going on between some folks who apply for loans in banks based on some sort of misunderstanding. I don't know if it's this kind of misunderstanding, but none of that can alter the best meaning of the statute. Okay, thank you, counsel. Thank you, your honors. We'll take this case under advisement. And we thank counsel for their excellent briefing and oral arguments. Thank you.